CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

JEFF MITCHELL (CABN 236225)
Chief, Criminal Division

CHRISTINA LIU (CABN 308362)
Assistant United States Attorney

    60 South Market Street, Suite 1200
    San Jose, California 95113
    Telephone: (408) 535-5051
    FAX: (408) 535-5081
    christina.liu@usdoj.gov

Attorneys for United States of America

<table>
<tr><td colspan="2" align="center">FILED</td></tr>
<tr><td colspan="2" align="center">Mar 19 2026</td></tr>
<tr><td colspan="2" align="center">Mark B. Busby<br>CLERK, U.S. DISTRICT COURT<br>NORTHERN DISTRICT OF CALIFORNIA<br>SAN JOSE</td></tr>
</table>

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) CASE NO. CR 26-70286-MAG |
|     Plaintiff, | ) |
| | ) NOTICE OF PROCEEDINGS ON OUT-OF-DISTRICT CRIMINAL CHARGES PURSUANT TO |
|     v. | ) RULES 5(c)(2) AND (3) OF THE FEDERAL RULES OF CRIMINAL PROCEDURE |
| YIH-SHYAN "WALLY" LIAW, and | ) |
| TING-WEI "WILLY" SUN, | ) |
|     Defendants. | ) |

Please take notice pursuant to Rules 5(c)(2) and (3) of the Federal Rules of Criminal Procedure

that on March 19, 2026, the above-named defendants were arrested pursuant to arrest warrants (copies

attached) issued upon an

☒    Indictment

☐    Information

☐    Criminal Complaint

☐    Other (describe) _____

pending in the Southern District of New York, Case Number CR 26-100.

In that case (copy of indictment attached), defendants Yih-Shyan "Wally" Liaw and Ting-Wei

v. 8/29/2025

"Willy" Sun are each charged with violations of:

Count 1:  Conspiracy to Violate the Export Control Reform Act
50 U.S.C. § 4819(a) and (b), and 15 C.F.R. §§ 736.2, 742.6, and 764.2.

Count 2:  Conspiracy to Smuggle Goods from the United States
18 U.S.C. § 371

Count 3:  Conspiracy to Defraud the United States
18 U.S.C. § 371

The maximum penalties are as follows:

Count 1:  20 years of imprisonment
3 years of supervised release
$1,000,000 fine
$100 special assessment
Forfeiture
Restitution

Counts 2, 3:  5 years of imprisonment
3 years of supervised release
$250,000 fine
$100 special assessment
Forfeiture
Restitution

Respectfully Submitted,

CRAIG H. MISSAKIAN
UNITED STATES ATTORNEY

Date: March 19, 2026

*/s/ Christina Liu*
Christina Liu
Assistant United States Attorney

v. 8/29/2025

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>YIH-SHYAN "Wally" LIAW,<br>RUEI-TSANG "Steven" CHANG, and<br>TING-WEI "Willy" SUN,<br><br>Defendants. | **SEALED INDICTMENT**<br><br>26 Cr.<br><br>**26 CRIM 1 0 0** |

## COUNT ONE
### (Conspiracy to Violate the Export Control Reform Act)

The Grand Jury charges:

1.      Beginning in or about 2024, certain executives, employees, and third-party affiliates of a U.S.-based manufacturer that designs and builds high-performance computer servers for artificial intelligence and cloud computing applications (the "U.S. Manufacturer"), including YIH-SHYAN "Wally" LIAW, RUEI-TSANG "Steven" CHANG, and TING-WEI "Willy" SUN, the defendants, conspired to divert billions of dollars' worth of the U.S. Manufacturer's servers to China, many of which were assembled in the United States. The U.S. Manufacturer's flagship products—servers integrating graphics processing units ("GPUs") manufactured by Nvidia Corporation ("Nvidia")—are subject to strict U.S. export controls barring their sale to China without a license. Those controls are in place to protect U.S. national security and foreign policy interests, among other things.

2.      The defendants and their co-conspirators used a particular company ("Company-1") based in Southeast Asia as a pass-through entity to give the U.S. Manufacturer's transactions that they arranged the appearance of legitimate commercial activity and to obscure their China-based end customers. YIH-SHYAN "Wally" LIAW, RUEI-TSANG "Steven" CHANG, and

TING-WEI "Willy" SUN, the defendants, worked with and directed executives of Company-1 to submit purchase orders to the U.S. Manufacturer to reserve and purchase large allocations of the servers from the U.S. Manufacturer containing Nvidia GPUs and coordinate their onward transshipment to China. To ensure that the allocations were approved internally at the U.S. Manufacturer, the defendants and executives at Company-1 prepared false documents and records, and transmitted false communications, purporting to show that Company-1 was the end user of the servers. Once Company-1 received the servers, at the direction of and in coordination with the defendants and others, including third-party brokers who worked closely with the defendants to order the U.S. Manufacturer's servers for customers in China, it shipped them to those customers in China. In furtherance of the scheme, Company-1, in consultation with the defendants, used a shipping and logistics company to repackage the U.S. Manufacturer's servers and place them in unmarked boxes to conceal their content prior to shipping them to their final destinations in China.

3.      The defendants and their co-conspirators took extensive measures to conceal their scheme. For example, to deceive the U.S. Manufacturer's compliance team, which was responsible for conducting audits of Company-1's purchases of servers to ensure adherence to U.S. export control laws, the defendants staged "dummy" servers—non-working, physical replicas of the U.S. Manufacturer's servers—for inspection at the locations where Company-1 was purportedly storing the servers it had purchased from the U.S. Manufacturer. However, the actual servers from the U.S. Manufacturer had already been unlawfully shipped to China. When questions were raised about Company-1's purchases of the U.S. Manufacturer's servers, the defendants used encrypted messaging applications to exchange draft responses containing false information about Company-1's sales and operations. Notwithstanding those questions, the defendants pressured certain of the

2

U.S. Manufacturer's compliance team members to authorize the shipment of servers to Company-1, knowing that the servers would then be secretly diverted to China.

4.  The U.S. Manufacturer profited significantly from the sale of servers to Company-1. Since in or about 2024, the defendants and their co-conspirators caused the sale of at least approximately $2.5 billion worth of the U.S. Manufacturer's servers to Company-1, the payments for which transited through financial institutions in the Southern District of New York. A substantial portion of that revenue came from the sale to Company-1 of the U.S. Manufacturer's servers that were assembled in the United States and subsequently diverted to China. By way of example, as a result of the defendants' scheme, between late April 2025 and mid-May 2025 alone, over approximately $510 million worth of the U.S. Manufacturer's servers assembled in the United States with Nvidia GPUs—and subject to U.S. export controls—were sold to Company-1 and then diverted to China.

### Background on the U.S. Manufacturer and the Export Control Regulatory Framework

5.  The U.S. Manufacturer is a publicly traded information technology company headquartered in San Jose, California. The company's core business is the design, manufacture, and sale of enterprise information technology systems for use in data centers, cloud computing platforms, telecommunication networks, and artificial intelligence applications. The U.S. Manufacturer's servers distinguish themselves through their ability to integrate third-party components, including GPUs manufactured by Nvidia. That capability has made the U.S. Manufacturer a preferred supplier for customers seeking to build or expand large-scale artificial intelligence computing infrastructure. The performance capabilities of these systems—and their potential applications in signals intelligence, autonomous weapons systems, nuclear weapons simulations, and other advanced military programs—are well understood by the U.S. government

3

and by foreign governments and institutions that seek to acquire them. In particular, China has been executing a state-directed campaign to dominate global artificial intelligence and has been using its exascale supercomputing capabilities for its military modernization efforts, development and deployment of advanced artificial intelligence surveillance tools, and artificial intelligence training capabilities.

6.       To protect U.S. national security and foreign policy interests, beginning in or about October 2022, and pursuant to its authority under the Export Control Reform Act ("ECRA"), the U.S. Department of Commerce, through its Bureau of Industry and Security ("BIS"), implemented license requirements for the export and reexport of artificial intelligence technologies to China and Hong Kong. In particular, under the Export Administration Regulations ("EAR"), BIS has placed restrictions on the export and reexport of items that could make a significant contribution to the military potential or nuclear proliferation of other nations or that could be detrimental to the foreign policy or national security of the United States. Under the EAR, such restrictions depend on several factors, including the technical characteristics of the item, the destination country, the end user, and the end use.

7.       Advanced artificial intelligence accelerator chips, such as the Nvidia B200, H100, and H200 GPUs, and servers incorporating such chips, are included on BIS's Commerce Control List as items that are subject to export license requirements for transfers to certain destinations, including China and Hong Kong. Beginning in or about 2023, BIS substantially tightened restrictions on the export and reexport of high-performance computing chips and GPU-accelerated server systems to China, imposing new licensing requirements and extending controls to cover indirect transfers of items to China through third countries. Those regulations reflect a formal determination that the computing capabilities in advanced artificial intelligence accelerator

4

hardware are of sufficient strategic significance that their transfer to China poses an unacceptable risk to national security.

8.    In addition to destination-based controls, U.S. laws and regulations impose specific documentation requirements on companies like the U.S. Manufacturer for exports of goods and technology from the United States. For example, pursuant to those requirements, exporters like the U.S. Manufacturer and their authorized agents are required to file accurate and truthful reports with BIS and U.S. Customs and Border Protection, identifying the end user and ultimate destination of the export. Such reports are material to those agencies' assessments of whether goods may be exported from the United States without a license, or at all.

9.    At no point did the U.S. Manufacturer or any of the defendants have a license from the U.S. Department of Commerce to export or reexport U.S.-manufactured servers containing Nvidia GPUs to China.

**The Defendants' Evasion of Export Controls and Illegal Shipments to China**

Overview of the Defendants' Roles in the Scheme

10.    In order to drive sales, co-founder, board member, and Senior Vice President of Business Development of the U.S. Manufacturer, YIH-SHYAN "Wally" LIAW, the defendant, conspired with others to sell the U.S. Manufacturer's servers to Chinese customers in violation of U.S. export control laws. Together with RUEI-TSANG "Steven" CHANG and TING-WEI "Willy" SUN, the defendants, and others known and unknown, LIAW sold servers from the U.S. Manufacturer containing Nvidia GPUs to Company-1, with the intention that they would be unlawfully diverted to China.

11.    The scheme began in or around 2024, when RUEI-TSANG "Steven" CHANG, the defendant, who served as a general manager in the U.S. Manufacturer's Taiwan office, agreed with

an executive of Company-1 ("Individual-1") to use Company-1 as a pass-through entity to purchase servers integrating Nvidia GPUs from the U.S. Manufacturer and route them to Chinese customers. At the time, CHANG had several clients with customers based in China, but export restrictions prohibited the U.S. Manufacturer from shipping servers to those customers directly. CHANG then introduced Individual-1 to YIH-SHYAN "Wally" LIAW, the defendant, who served as Senior Vice President of Business Development at the U.S. Manufacturer and oversaw members of its global sales teams, which included CHANG. LIAW, CHANG, and Individual-1 together agreed to a scheme to sell those servers to Chinese customers through Company-1, in violation of U.S. export laws.

12. The scheme operated as follows. YIH-SHYAN "Wally" LIAW and RUEI-TSANG "Steven" CHANG, the defendants, directed Company-1 to place purchase orders with the U.S. Manufacturer for servers with Nvidia GPUs to reserve allocations of those servers, purportedly for Company-1. Those servers were often assembled in the United States and shipped to the U.S. Manufacturer's facilities in Taiwan, then delivered to Company-1 elsewhere in Southeast Asia, and then routed to purchasers in China, including through a rotating cast of third-party brokers who worked closely with LIAW and CHANG. TING-WEI "Willy" SUN, the defendant, served as a third-party broker and "fixer" who worked with the other defendants and Company-1, facilitating orders and taking various steps to help conceal the scheme. SUN also introduced Company-1 to additional brokers, including a broker on whose behalf Company-1 ultimately placed orders with the U.S. Manufacturer for numerous servers containing Nvidia GPUs.

13. YIH-SHYAN "Wally" LIAW, the defendant, coordinated directly with Individual-1 on order volumes, timing, and GPU allocations. By in or about June 2024, LIAW recognized the importance of Company-1 to the U.S. Manufacturer's financial performance in meeting quarter-

6

end sales goals. Indeed, in or about June 2024, LIAW thanked Individual-1 for the "help for June" and promised "[i]n return" to "help [Company-1] the whole year." LIAW also directed Individual-1 to transfer tens of millions of dollars from Company-1 to the U.S. Manufacturer so that the U.S. Manufacturer could place Nvidia GPU allocation orders and reserve inventory for subsequent diversion to China through Company-1.

14.     As the scheme progressed, Company-1 became one of the U.S. Manufacturer's largest customers. In an internal spreadsheet documenting the U.S. Manufacturer's top customers for the fourth quarter of its 2024 fiscal year, Company-1 ranked as the U.S. Manufacturer's eleventh most profitable customer worldwide—accounting for approximately $99.7 million in revenue for the quarter—alongside major U.S. technology and social media companies developing hyperscale artificial intelligence infrastructure. In reality, however, Company-1 did not have the capacity to store or use the massive quantities of servers it was purchasing from the U.S. Manufacturer, and most of the servers it ordered at the direction of the defendants were instead diverted to China through a network of third-party brokers who worked closely with the defendants.

<u>The U.S. Manufacturer's October 2024 Audit</u>

15.     By late 2024, the rapid growth in orders from Company-1 prompted the U.S. Manufacturer's compliance team to place a temporary hold on shipments and initiate an audit. YIH-SHYAN "Wally" LIAW and RUEI-TSANG "Steven" CHANG, the defendants, took steps to remove the hold and undermine the audit. For example, CHANG conspired with another executive of Company-1 ("Individual-2") on how to prevent auditors from physically entering the areas of the data centers where Company-1 was purportedly keeping the servers it had purchased from the U.S. Manufacturer (but which, in reality, had been diverted to China). CHANG also

7

arranged for an auditor from the U.S. Manufacturer he described in writing as "friendly" to conduct the review. LIAW meanwhile emailed compliance personnel, urging them to "speed this process up" so that the U.S. Manufacturer could resume shipments to Company-1. Then, after Company-1 cleared the audit, LIAW directed Individual-1 that Company-1 needed to have in place purported data center lease agreements to demonstrate that Company-1 had sufficient space and capacity to justify the server volumes "in case [of an] audit later." Those lease agreements, which were often falsified by CHANG, purported to show that Company-1 had leased enough data center space to accommodate the significant volumes of servers it purchased from the U.S. Manufacturer. In truth, Company-1 did not have such leased space and, instead, most of the servers it purchased from the U.S. Manufacturer were diverted to China without ever being stored at a Company-1 data center.

### Late 2024: The Defendants Continue to Expand Their Scheme

16.    Towards the end of 2024, YIH-SHYAN "Wally" LIAW and RUEI-TSANG "Steven" CHANG, the defendants, worked to grow the U.S. Manufacturer's business in China by encouraging Company-1 to increase the speed and size of its orders. For example, on or about December 10, 2024, Individual-2 texted CHANG asking whether a shipment was "going to SZX [*i.e.*, Shenzhen] or HK [*i.e.*, Hong Kong]," to which CHANG replied, "if ship to HK can be faster[.]" At the same time, LIAW continued pressing Individual-1 to place more substantial purchase orders for servers that would be diverted to China, including servers with one of Nvidia's most advanced GPUs at the time, the B200. Indeed, on or about December 14, 2024, LIAW texted Individual-1, "Roughly how many you can take by January? Feb? March? April? Just roughly forecast will be fine . . . Then we can propose to [Nvidia] with the way they can accept . . . This is the only way to have [Nvidia] to promise the B200 allocation so far as I know . . ." Individual-1 responded, "Ok sir I'll work with Steven [*i.e.*, CHANG]."

8

17.    To support the push for an increased number of servers to Company-1 in early 2025, YIH-SHYAN "Wally" LIAW, the defendant, introduced Individual-1 to TING-WEI "Willy" SUN, the defendant. In doing so, LIAW texted Individual-1 that LIAW and SUN had "been doing business together for quite a while." SUN, who has worked as a third-party broker and "fixer" for LIAW since at least in or around early 2024, thereafter worked with LIAW, RUEI-TSANG "Steven" CHANG, the defendant, and Individual-1 and Individual-2, to perpetrate the diversion scheme described herein, including by introducing them to third-party brokers ("Broker-1" and "Broker-2") who diverted the U.S. Manufacturer's servers to China and on whose behalf Company-1 ultimately placed orders for numerous servers containing Nvidia GPUs.

18.    Contemporaneous communications reflect YIH-SHYAN "Wally" LIAW, the defendant, regularly coordinating with Broker-1 and Broker-2 for hundreds of servers for diversion to China. As one example, on or about April 7, 2025, Broker-2 texted LIAW about orders that Broker-2 had placed for hundreds of servers, noting that Broker-2 would speak with Individual-1 and RUEI-TSANG "Steven" CHANG, the defendant. Approximately two weeks later, LIAW sent Individual-1 a screenshot of additional messages from Broker-2, in which Broker-2 asked about the status of servers that Broker-2 ordered for certain "investors and customers" and expressed gratitude for the "hard work and dedication" of CHANG and Individual-1, which Broker-2 described as "essential in sustaining our collaboration." LIAW then texted Individual-1 asking, "How can we help [Broker-2]?" As reflected in these communications, the defendants understood that Company-1 was not the end user of the servers it ordered from the U.S. Manufacturer and, instead, that Company-1 was acting as a pass-through for servers being purchased by third-party brokers.

### Early 2025: The Defendants Continue Their Scheme Despite
### Increased U.S. Regulations and Enforcement Actions

19.    In or about 2025, as the United States continued to announce additional restrictions on exports, YIH-SHYAN "Wally" LIAW, RUEI-TSANG "Steven" CHANG, and TING-WEI "Willy" SUN, the defendants, knowingly disregarded those regulatory developments and related enforcement actions. For example:

a.    On or about January 14, 2025, LIAW sent Individual-1 a link to a White House press release announcing a new export rule involving artificial intelligence-related products, which was scheduled to take effect on or about May 13, 2025, and would have impacted the defendants' ability to route servers through Company-1 on their way to China. LIAW, referring to pending orders from Company-1 to the U.S. Manufacturer for servers with Nvidia GPUs, wrote to Individual-1, "We need to speed these up before May 13!" Similarly, a few days later, on or about January 17, 2025, LIAW texted Individual-1, "We can ship all your 512 x B200 by Feb. Let us run fast before May 13!" Days later, CHANG texted Individual-2 a photograph of a particular type of pallet for the servers that can "ship to China, HK [*i.e.*, Hong Kong] or any countries without any problems."

b.    On or about March 1, 2025, Individual-1 texted LIAW a link to a news article about men charged with violating U.S. export controls for the illegal movement of Nvidia artificial intelligence chips to China. Individual-1 then texted LIAW, "I'm very concerned Wally," to which LIAW responded, "They were interviewed by BIS/Singapore . . . We have not shipped to them for quite a while because BIS U.S. has questioned[.]" A few days later, LIAW texted Individual-1 about orders of servers Broker-1 placed with the U.S. Manufacturer through Company-1, stating "Dr. Willy [*i.e.*, SUN, the defendant] keeps on asking me [about] this deal. What is the update[?]" The next day, LIAW texted Individiual-1 that, according to CHANG, the

U.S. Manufacturer had only received payment for approximately 256 of the servers ordered by Broker-1, and urged Individual-1 to "speed it up since I have pushed all staffs to prepare 4000 this month." During this time, and as was typical between in or about 2024 and 2025, CHANG was also in regular contact with Individual-2 regarding purchase orders and logistics for the U.S. Manufacturer's shipments being routed through Company-1 on their way to China.

The U.S. Manufacturer's April 2025 Compliance Review

20.    In or about April 2025, the U.S. Manufacturer's compliance team temporarily paused shipments from the U.S. Manufacturer to Company-1. To address this issue, YIH-SHYAN "Wally" LIAW, the defendant, asked RUEI-TSANG "Steven" CHANG, the defendant, to assist Individual-1 in responding to inquiries from the U.S. Manufacturer's compliance team. LIAW emphasized that "You need to have strong and persuasive reasons to convince the [U.S. Manufacturer's] staffs!" CHANG and TING-WEI "Willy" SUN, the defendant, then drafted an email for CHANG to send to the compliance team in advance of an upcoming compliance meeting. After learning that the U.S. Manufacturer's compliance team had accepted CHANG's responses, CHANG messaged LIAW, SUN, and others, "Heheheh, Gooood news for everyone!" Then, on or about April 18, 2025, SUN sent Individual-1 a screenshot of an email from a member of the U.S. Manufacturer's compliance team that said, "[Company-1] may be released. The account may be unblocked. Please proceed with shipments including [intercompany purchase orders] from US to [Taiwan]," and texted Individual-1, "Passed!!!" That same day, LIAW texted Individual-1 the same screenshot of the email and wrote to Individual-1, "We will speed up the shipment right away! Please issue the B200 [purchase order] right away!"

21.    Within days, Company-1's purchase orders to the U.S. Manufacturer ballooned. Between in or around late April 2025 and mid-May 2025 alone, Company-1 purchased at least

11

approximately $510 million worth of servers assembled in the United States with Nvidia B200 and H200 GPUs from the U.S. Manufacturer. Those servers were then diverted to end customers in China through the defendants' network of brokers. For example:

a. On or about May 8, 2025, Company-1 purchased approximately 58 servers with Nvidia B200 GPUs from the U.S. Manufacturer for approximately $17.4 million. Those servers were sold to Broker-1 and Broker-2. The outbound consignees for those servers, *i.e.*, the entities to which the servers were ultimately shipped, were two China-based entities.

b. On or about May 12, 2025, Company-1 purchased approximately 60 servers with Nvidia B200 GPUs from the U.S. Manufacturer for approximately $18 million. Those servers were sold to Broker-1. The outbound consignee for those servers was a technology company based in China.

c. On or about May 15, 2025, Company-1 purchased approximately 60 servers with Nvidia B200 GPUs from the U.S. Manufacturer for approximately $18 million. Those servers were sold to Broker-1 and another broker ("Broker-3") who works closely with RUEI-TSANG "Steven" CHANG, the defendant. The outbound consignees for those servers were entities based in China.

22. YIH-SHYAN "Wally" LIAW, the defendant, also exchanged several text messages with Broker-2 in or about 2025 underscoring that he was aware of the U.S. export control laws that prohibited diversion of the U.S. Manufacturer's servers with Nvidia GPUs to China. For example, on or about August 6, 2025, Broker-2 sent LIAW a link to a U.S. Department of Justice press release regarding Chinese nationals who had been arrested for illegally smuggling artificial intelligence chips to China. LIAW responded by sending sobbing emojis to Broker-2. LIAW thereafter continued his coordination with RUEI-TSANG "Steven" CHANG and TING-WEI

"Willy" SUN, the defendants, to divert the U.S. Manufacturer's servers through Company-1 to China.

The U.S. Manufacturer's August 2025 Audit

23.    Given the increased volume of orders from Company-1, and the attendant risks of potential scrutiny that threatened to expose the scheme, YIH-SHYAN "Wally" LIAW, RUEI-TSANG "Steven" Chang, and TING-WEI "Willy" SUN, the defendants, conspired with Individual-1, Individual-2, and others, to ensure that Company-1 could pass additional audits and inspections of servers from the U.S. Manufacturer that were supposed to be maintained by Company-1 but which had been diverted to China.

24.    For example, between in or about July 2025 and August 2025, TING-WEI "Willy" SUN and RUEI-TSANG "Steven" Chang, the defendants, exchanged numerous text messages with Individual-1 and Individual-2 about an August 2025 audit of Company-1's purchases of servers, which had been requested by the U.S. Manufacturer's compliance team, including that they intended to use "dummy" servers to deceive the compliance team about the number of servers then in Company-1's possession. SUN directed Individual-1 and Individual-2 to order the dummy servers. CHANG and SUN then worked, together and with others, to stage those dummy servers at warehouses rented by Company-1, including by repackaging them with the U.S. Manufacturer's labels and boxes, for the purpose of passing the August 2025 audit of servers that the U.S. Manufacturer had sold to Company-1 and which were purportedly located in at the warehouses— but which had, at the time of the audit, already been diverted to China. Specifically:

a.    Between on or about July 2, 2025 and July 16, 2025, CHANG sent Individual-1 various screenshots of emails that CHANG previously received from a member of the U.S. Manufacturer's compliance team regarding an audit that the U.S. Manufacturer planned

13

to conduct of Company-1's server purchases. In those messages, CHANG told Individual-1 that there was a "high possibility" that the U.S. Manufacturer would only audit servers with Nvidia B200 GPUs that it sent to Company-1 in or about June 2025, and therefore, "we need to speed up for b200 preparation." Shortly thereafter, on or about July 20, 2025, SUN texted Individual-1, "Bro I can't reach [Individual-2]. I need 854 b200 labels cut out this month," referring to the U.S. Manufacturer's labels that SUN planned to affix to dummy servers for the audit.

b.      Between on or about July 27, 2025 and July 29, 2025, SUN texted Individual-1 about the resources needed to stage warehouses rented by Company-1 with dummy servers in advance of the audit, which SUN estimated to require "100 people in total," forklift operators, arranged meals, and a "20-person shuttle bus for easy travel between the hotel and the warehouse, allowing for short breaks."

c.      On or about July 30, 2025, SUN texted Individual-2 a draft email to send to a member of the U.S. Manufacturer's compliance team regarding the upcoming audit. The draft email stated, in part, "we confirm that all servers shipped between January 1 and April 1 – totaling 2,749 units – are currently located" in a particular data center. The next day, CHANG texted Individual-2, in part, that if the U.S. Manufacturer's compliance team "doesn't cross check with [a member of its finance team], the story should be ok."

d.      In or about August 2025, compliance personnel from the U.S. Manufacturer conducted the audit at warehouses rented by Company-1. During this time, SUN and his team took photographs and videos of the staged dummy servers to send to one of the U.S. Manufacturer's compliance auditors who was tasked with conducting the audit, but who was instead off-site enjoying entertainment paid for by Company-1. Some of those photographs and still shots of videos are below:

14

 

e.      The compliance audit was completed on or about August 14, 2025. That same day, SUN texted LIAW that the audit had involved "2,107 units in three warehouses," and sent LIAW photographs and videos of the staged dummy servers. LIAW responded, "That's spectacular!" Two days later, on or about August 16, 2025, LIAW pressed SUN to begin placing more purchase orders, to which SUN responded, "Wait until the audit is over. . . [the U.S. Manufacturer's auditor] should upload the full report tomorrow. All photos have been uploaded." In response, LIAW texted SUN various celebratory emojis and wrote "Order now!" Approximately two weeks later, while the results of the audit remained pending, LIAW texted Individual-1, "Steven [*i.e.*, CHANG] is pushing hard for the compliance for you, sir!"

25.      On or about August 20, 2025, BIS informed the U.S. Manufacturer that it had reason to believe that Company-1 was diverting the U.S. Manufacturer's servers to China, and that BIS therefore had requested a compliance hold on all shipments from the U.S. Manufacturer to Company-1. BIS subsequently advised the U.S. Manufacturer that BIS staff would be conducting a post-shipment verification ("PSV") of certain servers that Company-1 had purchased from the U.S. Manufacturer.

The December 2025 BIS PSV

26.    In or about December 2025, a U.S. Department of Commerce export control officer ("Officer-1") scheduled a visit to Company-1's warehouse to verify that Company-1 maintained the servers it had purchased from the U.S. Manufacturer in or about April 2025. Because those servers had been diverted to China, TING-WEI "Willy" SUN, the defendant, and others once again used dummy servers to attempt to deceive BIS.

27.    On or about December 18, 2025, the day before BIS's scheduled PSV, TING-WEI "Willy" SUN, the defendant, and Broker-1, arrived at a warehouse rented by Company-1. Once there, SUN, Broker-1, and others staged dummy servers to present to BIS. The group unboxed the dummy servers; used a hair dryer to remove and affix labels and serial number stickers to the server boxes and to the dummy servers themselves; and then re-packaged the dummy servers in the U.S. Manufacturer's boxes. Surveillance cameras recorded their work and captured them preparing the dummy servers, including as shown in the images below, in which SUN (left) and Broker-1 (right) are circled in white:



16

28.    The following day, on or about December 19, 2025, Officer-1 arrived at Company-1's warehouse. Officer-1 was met by, among others, a man who introduced himself as "Michael" and who purported to be an assistant from Company-1's local law firm, but who was in fact TING-WEI "Willy" SUN, the defendant. SUN then engaged with Officer-1 throughout the inspection, answering Officer-1's questions, falsely, about whether the servers had been stored at a particular data center after being shipped to Company-1.

29.    After BIS's inspection, and while the results remained pending, YIH-SHYAN "Wally" LIAW, the defendant, contacted Individual-1 and asked Individual-1 to place a new purchase order with the U.S. Manufacturer for additional servers. Shortly thereafter, Individual-1 texted LIAW to ask, "how do u want me to proceed with the PO [*i.e.*, purchase order] sir?" LIAW responded, "Exactly the same as before[.] Have you received the BIS OK letter?" In response, Individual-1 wrote, "Not yet[.] But spoke with Willy [*i.e.*, TING-WEI "Willy" SUN, the defendant] . . . He said he is optimistic." LIAW responded, "Great!"

30.    As of the date of this Indictment, BIS has not lifted its request for a hold on shipments from the U.S. Manufacturer to Company-1.

## STATUTORY ALLEGATIONS

31.    From at least in or about 2024, up to and through the present, in the Southern District of New York, China, Taiwan, and elsewhere, YIH-SHYAN "Wally" LIAW, RUEI-TSANG "Steven" CHANG, and TING-WEI "Willy" SUN, the defendants, and others known and unknown, knowingly and willfully combined, conspired, confederated, and agreed together and with each other to violate, and to cause a violation of, licenses, orders, regulations, and prohibitions issued under the Export Control Reform Act.

32.    It was a part and an object of the conspiracy that YIH-SHYAN "Wally" LIAW, RUEI-TSANG "Steven" CHANG, and TING-WEI "Willy" SUN, the defendants, and others

17

known and unknown, would and did export and cause to be exported from the United States to China items controlled under Subchapter I of the Export Control Reform Act, to wit, electronics components on the Commerce Control List set forth in Title 15, Code of Federal Regulations, Part 774, Supplement Number 1, without having first obtained a license for such export from the U.S. Department of Commerce, in violation of Title 50, United States Code, Sections 4819(a) and 4819(b) and Title 15, Code of Federal Regulations, Sections 736.2, 742.6, and 764.2.

(Title 50, United States Code, Sections 4819(a) and 4819(b); and Title 15, Code of Federal Regulations, Sections 736.2, 742.6, and 764.2.)

## COUNT TWO
### (Conspiracy to Smuggle Goods from the United States)

The Grand Jury further charges:

33.    The allegations contained in paragraphs 1 through 30 of this Indictment are incorporated as though fully set forth herein.

34.    From at least in or about 2024, up to and through the present, in the Southern District of New York, China, Taiwan, and elsewhere, YIH-SHYAN "Wally" LIAW, RUEI-TSANG "Steven" CHANG, and TING-WEI "Willy" SUN, the defendants, and others known and unknown, knowingly and willfully combined, conspired, confederated, and agreed together and with each other to commit an offense against the United States, to wit, smuggling goods from the United States in violation of Title 18, United States Code, Section 554.

35.    It was a part and an object of the conspiracy that YIH-SHYAN "Wally" LIAW, RUEI-TSANG "Steven" CHANG, and TING-WEI "Willy" SUN, the defendants, and others known and unknown, would and did fraudulently and knowingly export and send from the United States, attempt to export and send from the United States, and cause to be exported and sent from the United States, merchandise, articles, and objects, to wit, items controlled under Subchapter I of the Export Control Reform Act, namely, electronics components on the Commerce Control List

18

set forth in Title 15, Code of Federal Regulations, Part 774, Supplement Number 1, contrary to laws and regulations of the United States, to wit, the Export Control Reform Act and associated regulations, Title 50, United States Code, Sections 4819(a) and 4819(b), and Title 15, Code of Federal Regulations, Sections 736.2, 742.6, and 764.2, and fraudulently and knowingly receive, conceal, buy, sell, and in any manner facilitate the transportation, concealment, and sale of such merchandise, articles, and objects, prior to exportation, knowing the same to be intended for exportation contrary to such laws and regulations of the United States.

36.    In furtherance of the conspiracy and to effect the illegal objects thereof, YIH-SHYAN "Wally" LIAW, RUEI-TSANG "Steven" CHANG, and TING-WEI "Willy" SUN, the defendants, and others known and unknown, committed the overt acts set forth in paragraphs 1 through 4 and 9 through 30 of this Indictment, among others.

(Title 18, United States Code, Sections 371.)

### COUNT THREE
**(Conspiracy to Defraud the United States)**

The Grand Jury further charges:

37.    The allegations contained in paragraphs 1 through 30 of this Indictment are incorporated as though fully set forth herein.

38.    From at least in or about 2024, up to and including the present, in the Southern District of New York, China, Taiwan, and elsewhere, YIH-SHYAN "Wally" LIAW, RUEI TSANG, a/k/a "Steven Chang," and TING-WEI "Willy" SUN, the defendants, and others known and unknown, knowingly and willfully combined, conspired, confederated, and agreed together and with each other to defraud the United States and agencies thereof, by impairing, impeding, obstructing, and defeating, through deceitful and dishonest means, the lawful functions of the U.S.

19

Department of Commerce, an agency of the United States, in the enforcement and issuance of licenses relating to the export of goods.

39.    In furtherance of the conspiracy and to effect the illegal objects thereof, YIH-SHYAN "Wally" LIAW, RUEI-TSANG "Steven" CHANG, and TING-WEI "Willy" SUN, the defendants, and others known and unknown, committed the overt acts set forth in paragraphs 1 through 4 and 9 through 30 of this Indictment, among others.

(Title 18, United States Code, Sections 371.)

## FORFEITURE ALLEGATIONS

40.    As a result of committing the ECRA offenses alleged in Counts One and Two of this Indictment, YIH-SHYAN "Wally" LIAW, RUEI-TSANG "Steven" CHANG, and TING-WEI "Willy" SUN, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offenses alleged in Counts One and Two of this Indictment, including but not limited to a sum of money representing the amount of proceeds obtained as a result of the offenses.

### Substitute Assets Provision

41.    If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred or sold to, or deposited with, a third person;

    c.    has been placed beyond the jurisdiction of the Court;

    d.    has been substantially diminished in value; or

    e.    has been commingled with other property which cannot be subdivided without difficulty;

20

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and

Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the

defendants up to the value of the above forfeitable property.

(Title 18, United States Code, Section 981;
Title 21, United States Code, Section 853; and
tle 28, United States Code, Section 2461.)


FOREPERSON

_Jay Clayton_
JAY CLAYTON
United States Attorney

21

Mod AO 442 (09/13) Arrest Warrant    AUSA Name & Telno: Juliana Murray, 212-637-2314; David Robles, -2550; Kevin Sullivan,-1587

# UNITED STATES DISTRICT COURT
### for the
### Southern District of New York

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No.   26 Cr. |
| YIH-SHYAN "Wally" LIAW, | ) | |
| | ) | **26cr100** |
| | ) | |
| _Defendant_ | ) | |

## ARREST WARRANT

To:      Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay

_(name of person to be arrested)_     YIH-SHYAN "Wally" LIAW

who is accused of an offense or violation based on the following document filed with the court:

☑ Indictment          ☐ Superseding Indictment          ☐ Information          ☐ Superseding Information          ☐ Complaint

☐ Probation Violation Petition          ☐ Supervised Release Violation Petition          ☐ Violation Notice          ☐ Order of the Court

This offense is briefly described as follows:

Conspiracy to Violate the Export Control Reform Act (50 U.S.C. §§ 4819(a) and 4819(b); and 15 C.F.R. §§ 736.2, 742.6, and 764.2)
Conspiracy to Smuggle Goods from the United States (18 U.S.C. § 371)
Conspiracy to Defraud the United States (18 U.S.C. § 371)

_Tammi M. Hellwig_

Date:      03/17/2026

_Issuing officer's signature_

**Tammi M. Hellwig**

City and state:      New York, New York

_Printed name and title_

| Return |
|---|
| This warrant was received on _(date)_ _____ , and the person was arrested on _(date)_ _____ at _(city and state)_ _____ . |
| Date: _____ |
| _Arresting officer's signature_ |
| _Printed name and title_ |

Mod AO 442 (09/13) Arrest Warrant     AUSA Name & Telno: Juliana Murray, 212-637-2314; David Robles, -2550; Kevin Sullivan,-1587

# UNITED STATES DISTRICT COURT
### for the
### Southern District of New York

| | |
|---|---|
| United States of America<br>v.<br><br>TING-WEI "Willy" SUN,<br><br>_____<br>*Defendant* | )<br>)<br>)<br>)<br>)<br>)<br>) |

Case No.   26 Cr.

2 6 CRIM   0 0

## ARREST WARRANT

To:     Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay
*(name of person to be arrested)*     TING-WEI "Willy" SUN_____,
who is accused of an offense or violation based on the following document filed with the court:

☑ Indictment        ☐ Superseding Indictment        ☐ Information        ☐ Superseding Information        ☐ Complaint

☐ Probation Violation Petition        ☐ Supervised Release Violation Petition        ☐ Violation Notice        ☐ Order of the Court

This offense is briefly described as follows:

Conspiracy to Violate the Export Control Reform Act (50 U.S.C. §§ 4819(a) and 4819(b); and 15 C.F.R. §§ 736.2, 742.6, and 764.2)
Conspiracy to Smuggle Goods from the United States (18 U.S.C. § 371)
Conspiracy to Defraud the United States (18 U.S.C. § 371)

Date:     03/17/2026     _____
                                                                                     *Issuing officer's signature*

                                                                                     **Tammi M. Hellwig**

City and state:     New York, New York     _____
                                                                                     **Tammi M. Hellwig**
                                                                                     *Printed name and title*

| Return |
|---|
| This warrant was received on *(date)* _____ , and the person was arrested on *(date)* _____ at *(city and state)* _____ . <br><br>Date: _____                      _____<br>                                                                                     *Arresting officer's signature*<br><br>                                                                                     _____<br>                                                                                     *Printed name and title* |